1499, State of New Jersey, Village of Scarfield, New York, v. Yellen, although I guess it's Attorney Ionoy? Ionoy, your honor. Good morning. All right, let's hear from you. Good morning, your honors. May it please the court. Despite 100 years worth of text, precedent, and practice, the IRS, for the first time, has singled out state tax credits for disfavor under Section 170. That is unlawful and arbitrary and capricious. I'd like to ask Attorney Ionoy to come forward and speak to this matter. I'd like to make two points. First, the final rule is contrary to law. As this court has explained, tax benefits are simply not the kind of bargain for benefits that count as consideration. Were it otherwise, the charitable deduction itself would have to be offset. But that outcome finds no footing in any of the traditional tools of statutory interpretation. Nor do the IRS's reasons for distinguishing between state tax credits and other tax benefits sound in the charitable contributions text. Second, the IRS's distinctions between state credits above 15% and all other tax benefits are arbitrary and capricious. Previously, the IRS itself recognized that there is no reason to distinguish between the value of a state tax credit and the value of a state or federal tax deduction, or to draw a bright line based on the amount of the tax benefit in question. As several tax scholars have recognized, that prior position was right, and the agency's about face is illogical and wrong. This court should reverse. So to the extent that those distinctions are based in, because none of this is in the text, right? The whole quid pro quo gloss on charitable contributions not from the text. And you don't quibble, you don't dispute that that's a legitimate concept. You're just saying it doesn't apply here. That's right, Your Honor. It's a gloss on the text. And so am I understanding that your view is that because that in interpreting the meaning of charitable contribution, and particularly the application of the sort of quid pro quo gloss on that definition, the agency is not allowed to make pragmatic distinctions based on the practical real world implications of a different choice. If it's not sort of philosophically pure, and that's not really a good way of pronouncing it, but I'm trying to get the ability of the agency to bring some practicality to its definitions here. Your Honor, I think after Loeb or Bright, the instructions are you apply all of the traditional tools of statutory construction to get at the right answer. And so I think we're all interpreting, given the quid pro quo doctrine, whether a payment is still a gift or contribution. I think that's the gloss on the text here. But to figure out whether or not a payment is still a gift or a contribution, you actually have to look at what's going on vis-a-vis statutory context and precedent and practice. And so for 100 years from the time of the charitable deductions enactment in 1917 until the TCJA, it had been the case that all federal and state tax benefits, including state tax credits, had been deductible or had still been—did not require an offset for the federal charitable contribution. And so even with the enactment of the TCJA, Loeb or Bright still instructs we have to figure out what the best answer is using all of the traditional tools of statutory interpretation. And I don't think the agency has a particular— It sounds to me rather, not just you, kind of Chevron and light. Your Honor, I think that's a question here is the degree to which there's any deference afforded the IRS in this particular case. And I agree, Judge Robinson, that the IRS generally is the tax expert here. But we actually have a discrete question of law, which is whether or not a state tax credit as a tax incentive would otherwise require some sort of offset in the federal charitable deduction. And here in Section 170, the IRS has only been granted the authority to verify whether a charitable contribution has been actually made rather than interpreting whether or not something is a charitable contribution in the first instance. You lean heavily on the absence—on the notion that in concluding that certain charitable contributions that are offset by tax credits aren't charitable contributions, that the IRS hasn't also included deductions, right? That's the distinction you lean heavily on and say, well, that distinction is not supported by the text. So this whole enterprise is a wandering into terrain beyond the authority of the agency. And I'm just trying to figure out that distinction, it seems to me, flows from a pragmatic rationale. And I'm trying to figure out whether what you're saying is the IRS can't do that. If we're going to consider whether tax credits undermine the status of a contribution to a nominal charity as charitable deductions, it has to rise and fall together with deductions. There's not a—a court couldn't—forget about the agency—a court couldn't decide that those two things were subject to different treatment. Right, Your Honor. And I appreciate your allusion to pragmatism because I think in a pre-Loper Bright world, that may have been a proper consideration for the court or the agency to apply. But in a post-Loper Bright world, you have to apply, as I've said, the traditional tools of statutory construction, things like the text, context, precedent, practice. But pragmatism, qua pragmatism, is simply not that kind of tool, especially after the Supreme Court's instructions. And so as far as pragmatism goes, unless it's rooted in some other textual consideration, it can't get the agency where it needs to go. And I agree, Your Honor, that there is no textual distinction to be made between even state tax deductions and state tax credits here. If you're going to allow for a full offset even when you receive a state tax deduction, the same should hold true even if you're talking about a state tax credit. And that's for, you know, good reasons of federalism, for example. States have always been determined to have the leeway to incentivize charitable giving to programs or entities that they see fit. That had always been the case from 1917 until the TCAJ's enactment. But you might be proving too much there, right, because it's not the case that Congress couldn't decide to expand the notion of Congress could certainly include tax credits and tax deductions. And I think, I guess what I'm getting at is can the, could the agency have here said, yeah, neither of them, neither of them are, you can't count either of them as a deductible charitable contribution to the extent that it's offset by a state tax benefit, whether it's a tax credit or a tax deduction. Your Honor, I think that that's precisely the kind of question that Congress, it's in Congress's bailiwick to resolve. And, for example, if you look at the text of Section 170, Congress has actually gotten quite granular in figuring out what should or shouldn't be fully deducted and the kinds of charitable entities that would require different rules for offset. It talks about things like taxidermy. It talks about things like food donations. And so Congress is capable of saying we're going to set aside state tax benefits, whether it's a state tax credit or a state tax deduction. But that hadn't been the case for 100 years. And even after the enactment of the TCJA, that wasn't rooted in Section 164. It wasn't actually rooted in any differing meaning or disagreement with the charitable contribution provision. And, in fact, Congress had expanded the charitable contribution provision. And so Congress can say we're only going to allow a full deduction for the federal tax benefit itself and set aside state tax credits. But that's simply Congress's job and not the agency's. And I think to the extent that the text governs and we have to apply traditional tools of statutory construction, the agency was not entitled to distinguish further between state tax credits and state tax benefits when the same kinds of considerations would apply to both equally. Equally? I thought that there really was a practical difference between allowing the deductions as opposed to allowing the credits. There's something that, you know, the wheel within the wheel within the wheel. It happens when you do deductions rather than with credits. As a practical matter, one is easy to do, one is virtually impossible. Or so somebody told me. To be sure, Judge Sack, I think that, you know, a deduction is obviously a decrease in your taxable income. Whereas a credit is a decrease in the amount of the tax itself. But as the Supreme Court has made clear in cases like Randall v. Lost Garden, as the tax court has understood, tax benefits in general are not seen as things like an accession to wealth, so income, or an amount realized under a sale under other provisions of the tax code. And so for the traditional tools of statutory construction that are at issue here, state tax credits and state tax deductions are on the same footing. And the IRS doesn't really point to any textual distinctions between them. It really talks about the amount of revenue loss that is a result from the temporary SALT cap. But if I may, Your Honors, I think that that also doesn't work because from 1986 onward, for example, the alternative minimum tax allowed a full deduction for both state credits and state deductions, even though you couldn't take a SALT deduction yourself. And so that has always been seen to cohere with a full charitable deduction. And Congress had simply not seen fit to change the definition or change the treatment, you know, in 2017 or onwards. Are any of the funds to whom the contributions at issue here have been made eligible pursuant to 701C2 versus 701C1? And otherwise, are all of the funds here that to which the charitable, and I'm using air quotes not to be snarky but just to reference the section, those contributions are made state funds, essentially, as opposed to unrelated nonprofits? Your Honor, if you're referring to the difference between 170C1 and 170C2. That's what I am. I mixed my numbers. No, no, not at all. I would just say that is actually not what the IRS relied on here because— No, no, I know that. They could have, and I'm puzzled that they didn't. But I'm curious just as a matter of fact, not as a matter of like argument.  Whether here they're all 170C1. So the state plaintiff's programs are 170C1, but states had enacted hundreds of programs that would be under the 170C2 ambit. They're a third-party 501C3 organization that the state just wants to direct people to donate to. The reason I'm asking, I was partly thinking about Shidelman, and I was thinking about this rationale that the benefit of the deduction comes from a different party from the recipient of the donation. And I was just trying to think about whether the IRS could make a— whether that could support a distinction from the IRS in the definition of a charitable contribution that they didn't make, and I know that. But I don't know if you have an opinion on that. I do, actually, Your Honor. And I want to ask another question. Sorry, Judge Perez. Is that like the appropriate reading that we should be reading Shidelman to stand for? Like the idea that there is a distinction when the donor is not the same? Your Honor, I will confess to not being the tax expert here, but my understanding is that, as the tax scholars have said, there's no reason to actually distinguish quid pro quo principles when it's a third party versus the donee who's actually offering a state tax credit because you're really only looking at the benefit that's ignoring to the contributor. Do you think Shidelman didn't do that, or do you think Shidelman did it and the tax experts say that's a bad idea? No, I think Shidelman could be read narrowly to only talk about quid pro quo in that instance. I don't think it actually matters in this case because what Shidelman is getting at is even the receipt of a tax benefit, and even when that tax benefit, let me put it this way. Under 170C1, you could donate to the federal government itself. That could still be charitable, and you could still get a charitable deduction in return. So in that case, you're not actually involving a third party. You're donating directly to the federal government, and you're still getting a full deduction in return. That would not be a quid pro quo, even though the federal government is the one actually providing you the money. And why wouldn't it not be? Because tax benefits, a tax incentive to donate to an organization, even when that organization is the one providing you a credit, in which case it's a government, is simply not the kind of benefit. Right, but they don't get to use the part that they don't return, right? I mean, there's a part that they would give back that they can't use for a purely public purpose. So that seems, I mean, I think an ordinary person listening would be like that's a kickback. Like there's a portion of it that is going for something, and then there's a portion that somebody's retaining. And how is it analytically different? Two responses, Your Honor. First is I think, for example, there's still a sacrifice for the vast majority of the programs that the final rule covers. And just to put it in concrete terms, suppose that there's a marginal taxpayer or there's a taxpayer who donates $100 is subject to the highest tax bracket of 37%. And you're entitled to, let's say, a 20% credit from the state. You're still making a financial sacrifice. It's not a kickback. You're being incentivized to donate to the state. There's an extra incentive, but you're still making some sort of financial— Well, at the end of the day, when you get your deduction on the federal side, aren't you actually ending up better off than you would have been if you'd never made the contribution to begin with? You're better off having made the contribution to begin with, but that's because it's a tax incentive. So you're still enacting a cost. You're still paying $100, and you're still going to be cost, in my example, $43. So that's minus the state tax credit, and that's also minus the benefit of the full federal charitable deduction. But you're still losing money. And the point here is that— But it also is the donee, right? And doesn't that make a difference about it not being available for a purely public purpose, which gets into the trouble about whether or not it being a charitable contribution? Your Honor, I actually don't think the exclusively public purpose language is at issue here for a couple of reasons. One is that, as I've already mentioned to Judge Robinson, the rule does cover C-2 organizations and not just C-1 governments, which would include the United States. And so that is actually not the rationale that the agency is relying on. But second, as I had already mentioned, the federal government is enumerated. The United States is enumerated as one of the C-1 entities. And so that for exclusively public purpose language can't be doing the work there because you're still getting a benefit. You're still getting a tax benefit when you're donating directly to the United States, even though you're taking—you're getting a benefit, but you're not taking any offset there. And so it's still exclusively for public purposes. And third, even the state programs in this case, even though I don't think it matters because it's a facial challenge, have made clear that their funds that are going to those programs are for exclusively public purposes. So I'd point your honors to NJSA 54-4-66.7a. The funds, quote, shall be expended exclusively for public purposes. Our friends in New York say that it should go to health care and education. And so they are going to public purposes, but the tax benefit that ignores for donating to the donee is simply not the kind of benefit that would render your deduction or your donation not exclusively for public purposes. All right. I sense a pause. So why don't we hear from you when you come back. I'm glad you're not a Texas. All right. Oh, sorry. Wrong thing. Attorney Tenia. Oh. Jumping ahead. Thank you. Attorney Rosen. I'll get it right. I'll just keep naming names and eventually. Thank you, Your Honor. May it please the Court. I'd like to pick up where my friend on behalf of the states left off in terms of talking about the interpretation of Section 170. I think it's important to recognize that the court in this case is not writing on a blank slate. We have decades of judicial precedent interpreting this particular statute. Its original form was enacted in 1917. It was made part of the Internal Revenue Code in 1954. And there is a fairly significant body of case law interpreting Section 170, in particular the treatment of tax benefits, whether they're federal or state, and whether those would constitute something under the Internal Revenue Code that would need to be recognized, whether as an item of income, whether as an upward adjustment or downward adjustment to basis, or as something of value, includable, and cost of goods sold. And in all of the cases, the courts have consistently treated tax credits, tax benefits coming back to a taxpayer as a reduction of tax liability. Right. I mean, all of those cases may make sense, do make sense, I presume, in the context of the issue before them. But it seems to me we have a very specific question here, which is, what is a gift or contribution under Section 170, right? Sure. And so whether something is income for the purpose of some other concept doesn't necessarily answer that question. We do have cases telling us that when you receive a benefit in return, then it's not a gift or contribution, right? And so I'm trying to get my head around the notion that this isn't a benefit in return. The fact that the contributions plummeted when the benefit in return went away, I think, reinforces the notion that this really is a quid pro quo. Why doesn't Hernandez in the American Bar Endowment case resolve this? I think for a few reasons, Your Honor. I think, number one, the purpose of a tax incentive is to encourage taxpayer behavior in exchange for getting a benefit in the form of the tax incentive back. And so- You mean that's the purpose of a charitable donation, to get an incentive to yourself, as opposed to a public interest? Well, the Supreme Court, I think, made clear in Hernandez that we're not going to be looking at subjective intent or whether a contribution is made with a good heart or a bad heart. The question is whether the external features of the transaction support the allowance of the charitable contribution deduction. I think when you look at, I mean, in particular when you're talking about Section 170, the tax court's opinion in Browning, which is cited in the plaintiff's appellant's briefs, dealt specifically with Section 170 and whether or not a state tax credit could be characterized in part as a gift and in part as a sale. And the court concluded in Browning that no, for purposes- I'm sorry, apologies, that was the Temple case, T-E-M-P-E-L, not Browning. And the court concluded there that no, you can't because the state credits don't increase a donor's wealth. I wanted to go back to a point that came up earlier, which is distinguishing credits from deductions. I think it's important to note that when Section 170 was codified in 1954, the highest tax brackets, New York State and Federal, were 98%, which is equivalent to a 98% credit at the time that this particular statutory provision was enacted. So what's the difference between a credit and a deduction? At the end of the day, it's just the value. What's it worth? So with respect to the village of Scarsdale, which offers a 95% credit, a taxpayer in the highest tax brackets when Section 170 was enacted would have actually gotten a better benefit for those contributions than a taxpayer making a contribution today. So there's at least an argument that, yes, there may be a difference in what it's worth, although you could come up with scenarios where a really rich person's deduction is greater than a less wealthy person's credit. I mean, you can do that. But it seems to me the stronger argument for differentiating is the complexity of calculating the benefit that you're receiving. Credit, I mean, if it were a refundable credit, it would be the easiest, right, because it's sort of fungible with cash practically. This is the next step down. It's pretty darn close. It's a dollar-for-dollar offset to the extent you have a tax liability. That seems infinitely simpler than, well, it depends on your marginal tax rate and this and that and this and that. And why isn't that the distinction that supports the IRS's, the agency's distinction? I think that's a distinction, as my friend said, that could and could have been or can be drawn by Congress. But there's looking at the single best meaning of the statute and looking at the delegations of rulemaking authority that have been granted to Treasurer and the IRS to promulgate rules, this is beyond the scope of their authority to draw those distinctions. A benefit is either a quid pro quo or it's not. And the type of line drawing that was done in this regulation was without authority to do so. Looking first to Loeb or Bright, putting aside the delegations of rulemaking authority that my friends discuss on brief, there's no way that you can conclude that the single best reading of Section 170 would allow for the treatment of a credit as a quid pro quo but not a deduction. So when you look to the delegations, the express delegations of rulemaking authority that would be applicable here, neither of them apply. So starting at first principles, agencies have no authority to issue rules or regulations except as provided by Congress. As the Supreme Court indicated in the Louisiana Public Service Commission. Now, there are two delegations of rulemaking authority that my friends address on brief. The first one is Section 170A1, which grants to the Secretary the authority to promulgate rules to verify charitable contributions. Well, to verify a contribution does not mean to define what a contribution is in the first place. To verify something, plain dictionary definition of verify is to prove that something is true. And again, going back to Loeb or Bright, Section 170A1 does not expressly delegate to the agency the authority to give meaning to a particular statutory term. Where did the idea that it's not a gift or a contribution if it's a quid pro quo come from? Did the agency come up with that idea in the first instance and then courts blessed it? I believe it was the other way around, Your Honor. Courts came up with that. I think it was developed first through the case law before it was embodied into regulations. How did a case come about? This is a chicken-egg question, but how would it have gotten to a court if it wasn't a case where the agency took some position? Well, they took a position. I don't believe it was a regulatory position. It was a position on examination. And was that within their authority? Well, certainly within the agency's authority, as in this case, to maintain a litigating position, that the best interpretation of contribution or gift should subtract out what would be a quid pro quo, and the case law has developed around that. But the authority to come up with that position, I guess your argument is they have the authority to do it because that's the best rating of the statute. Correct. Okay. Correct, Your Honor. And they don't have the authority to do it here because it's not.  Now, the defendants rely heavily on a general grant of rule-making authority in the Internal Revenue Code, that's Section 7805A, which says the secretary shall prescribe all needful rules and regulations for the enforcement of this title. Some additional text, but that's what I'm... Well, but the additional text is kind of interesting here, right? Because it's including all rules and regulations as may be necessary by reason of any alteration in law in relation to general revenue. And their argument is exactly that that's what this is. But this provision here, putting the weight on that to give them an express grant of rule-making authority, is, first of all, inconsistent with the language of the grant of authority itself. The alteration of law doesn't give the secretary the authority to alter the law, but to promulgate needful rules and regulations for the enforcement of this title. Fair. And I think it's important to note that under 7805, it's a general grant of rule-making authority. If you were to read it as a broad grant of legislative rule-making authority, it would render superfluous the hundreds of express delegations of authority that Congress has put throughout the Internal Revenue Code, including in Section 170. And importantly, when you look at the two enabling statutes that were in issue in Loper Bribery, 16 U.S.C. Section 1853A1, Cap A, and 1853B14, they read substantively the same as Section 7805A. 1853A1A states that authorizes the Secretary of Commerce and the National Marine Fishery Service to promulgate rules and regulations, quote, necessary and appropriate for the conservation and management of the fishery. 1853B14 reads quite similarly, authorizing conservation and management measures, as well as other measures determined to be necessary and appropriate. The Supreme Court gave no deference to that regulation. All right. That's a helpful point, and I'm not hearing any questions. I think we're going to call your time. Thank you. And now I apologize for my confusion earlier. Attorney Tineo or? Exactly your honor. Good morning, and may it please the court. My name is Rebecca Tineo, and I represent the defendants in this case. The plaintiffs created their funds to give their residents a means to recreate an uncapped federal SALT deduction by rebranding it as a Section 170 charitable contribution deduction. Residents make their SALT payments through the funds, and in return they get nearly all of those payments back in the form of tax credits. The regulations treatment of these return credits as benefits that should reduce the deductible amount on federal taxes represents the best reading of Section 170. Can I ask, I mean, let's assume we agree with you that this is a shameless workaround, right? But there's a long tradition in this country of Congress passing tax laws and lawyers and accountants figuring out workarounds. Congress may intend to increase tax revenues by making this change or that, and then the lawyers and accountants go to work and they look at the language and they try to find loopholes and they try to find ways to say, ah, we're going to hang on to our money, we're going to not give you your increased revenue by doing X, Y, and Z. Isn't the question not whether it's a shameless workaround, but whether it's a shameless workaround that is successful within the language of the statute? I mean, I take your point about the workaround and the desire to stop it, but I think the argument is that Congress is the one that then has to step in and plug the holes if they've left room for a workaround. Yes, Your Honor, thank you. On that point directly, there's really no support in the law that Congress has to, as Your Honor said, plug all of the holes that might be created by a workaround of whatever moral character. And in Bob Jones University, the 1983 case, pre-Chevron, the Supreme Court specifically said that with respect to 170 and its scope and the interpretations, the Supreme Court expressly said that the IRS, not Congress, can, through its interpretation of 170, alter the scope of Section 170 without Congress. Is it your position that Loeb or Bright is sort of like repealing a statute where we go back to the pre-Chevron state of the law, or do we look at the way that the Court described the role of the agency in Loeb or Bright to establish the post-Chevron state of the law? I think Loeb or Bright certainly gets rid, of course, of this automatic deference, right? When a statute is ambiguous, courts no longer simply assume or defer to the agency's interpretation. So the Court exercises its traditional role of determining the best reading here. But I think that Loeb or Bright still very much makes room for all of the sources of authority and delegation that the Court has asked about this morning. So Loeb or Bright expressly makes room for statutory delegations in 7805 and in 170 itself, which are not in tension. They work together perfectly fine. Loeb or Bright still makes a lot of room for expressly for scheme or deference, looking to the agency that historically implements and interprets a statute, and if the agency's interpretation has the power to persuade, then that interpretation is entitled to respect. So I think Loeb or Bright, of course, gets rid of the automatic deference in an ambiguous or silent statute, but it still makes room for all these traditional sort of sources that courts have always looked to, Your Honor. So pre-2017, did the agency, was it getting it wrong by allowing full deduction of charitable contributions that gave rise to state tax credits? Was it defying Congress's intent in the statute? Your Honor, I think pre-2017 there certainly was a policy tolerance for programs, and, of course, as my colleagues have rightly pointed out, there are other programs aside from the SALT workaround funds to which the regulation does apply. And so there was a policy tolerance for it. The IRS noted in discussing the proposed rule and in implementing the actual regulation that it was keeping an eye on state and local tax credit programs. It had seen the use of these programs increasing over time. State and local tax credits have become increasingly commodified. So I think the inciting event certainly was the passage, the alteration of the law, as Your Honor noted, and the passage of the SALT cap and then the creation of these workarounds. And it is certainly a great American tradition as well that when workarounds are created, then the IRS looks at them and decides if it wants to respond in order to implement a number of legitimate purposes, one of which is implementing and maintaining the purpose of the SALT cap itself. But the charitable contribution statute wasn't amended in 2017. And so unless we're saying that it has a meaning that changes through time depending on other provisions that get adopted around it, then either the agency got it wrong pre-2017 and allowed all sorts of charitable deductions that it shouldn't have, or it's wrong now, or you're saying it doesn't have a fixed meaning and the agency can decide contextually what it is. I guess those seem like the three options. Which are you saying? I would say that it was not getting it wrong. It was, as a matter of policy, administrability, and considerations like that, it was assessing the potential for abuse of the existing state and local tax credit programs, and essentially it decided that it was going to take the longstanding quid pro quo rule and now apply it to state and local tax credits. So the only source from IRS or Treasury that addressed how state or local tax credits should be treated under 170 was this 2010 chief counsel advice memorandum. So it was the only time that the IRS had spoken. And, of course, as we explained in our briefing, under 266110, a chief counsel advice memo was not presidential and all of those things. But the IRS was aware of all these programs out there that were doing this, and it wasn't going back and saying, wait a minute, you owe us more money. In the same way. It wasn't wholly apart from its official statements. It was a matter of enforcement was not saying, oh, you've underpaid your taxes if you claimed a charitable deduction for something for which you got a state tax credit. As a matter of enforcement, you're correct, Your Honor. And I think we have to look at, of course, the extremely large percentage of the credits that's embodied in the states and localities' newly created funds. That is, you know, they really pointed to nothing comparable to that in any previous state or local tax credit programs. The percentage of the tax credits now is 85% to 95%. That's enormous. And as the New York expert, and this is in the record, Your Honor, pointed out, in the routine case, the taxpayer is going to profit now to come out ahead. And so the IRS was not getting it wrong at all. And, in fact, I'd like to return a little bit to the basis for why the current interpretation is the best reading. One is this statutory background embodied in the emphasis in the original War Revenue Act, the emphasis in Section 170C that the nature of these payments really should be directed to charitable purposes, exclusively public purposes, as Your Honor pointed out. I'm sorry. I was waiting for my chance to ask you to go through this, so I'm hoping you will still have the opportunity. But I'm still sort of stuck on the idea that in your exchange with Judge Robinson, it wasn't a this is what the statute is compelling. It was a this was a policy. And now I think what you're about to do is tell us that this is the best reading of the statute textually. So is there a reason why those two things can cohere well? Yes, Your Honor. So the overall reading, first of all, of the statutory language is that it wants to emphasize and incentivize charitable giving. Now, the statute actually just says charitable contributions. Section 170C then says charitable contributions are contributions or gifts to, you know, a state entity, for example. And the Supreme Court has further elucidated that that means no quid pro quo. The Supreme Court in Hernandez and American Bar Association said that for something to really be a charitable contribution or gift, and that means you're not getting for that portion of it that you're going to claim as a charitable contribution or gift, you're not getting something back in return. And in Hernandez, the Supreme Court looked at actually the legislative history of Section 170 from 1954 and said that Congress did intend to differentiate between unrequited payments and payments for which you get valuable consideration. And so the Supreme Court. And the way they did that was the who was giving it back, and that's where the donee being the one returning it is why it matters. Is that right? Yes, although actually, to your honor, a slight diversion. In 2020, there was a further amendment to the regulation saying that if a third party gives you the benefit, for example, if you make a donation to the ASPCA and then New York State gives you tax credit saying that's great that you did that, we're going to give you a tax credit, then that would actually be treated the same. So third party compensation has been addressed in regulation now. So we have the general statutory emphasis on charitable giving. We then have the interpretation by the Supreme Court that this means a payment without compensation. And actually, I believe Judge Robinson, you asked, you know, where did they come up with that? Well, we have a 1967 IRS revenue ruling. So that's even before Hernandez American Bar Endowment that says, you know, it addresses, you know, if you go to a charitable gala and you pay $1,000 for your ticket and, you know, the value of your meal was $200, then you cannot include the value of the meal, the $200, in the amount that you get the deduction for under Section 170. So, in fact, as far back as 1967, the IRS had issued public guidance that that's how they viewed the charitable contribution. Can you, you've given three sort of background considerations as to why this is the best reading. And the first was the emphasis on charitable giving. And I assume that the funds to which these donations are made for the purposes of, I think, medical and education services would view their services that they're providing as within the scope of charitable giving. Why doesn't that point either be, why isn't it either a wash or it helps the other side on this case? Well, we're not really here to dispute, you know, that, Your Honor. I think that the IRS, when it was discussing the proposed rule and then when it implemented the regulation, said that its concern was that these funds would distort charitable giving and actually take away from truly gratuitous donations to other kinds of organizations that don't give you a tax credit back. And so, yes, there is certainly still a tolerance for taxpayers who want to donate to these state or locality established funds. That's why tax deductions are treated differently. That's why there's a 15% de minimis exemption in the new regulation to treat tax credits the same as tax deductions here. So, you know, the IRS, I think, as you said a while ago, is not insisting on being philosophically pure right here. It is leaving some exceptions and carve-outs to treat people fairly, to treat different programs sort of similarly. But as I think to another question that Your Honor asked before, there were pre-existing regulations, so IRS regulations that themselves embodied the quid pro quo principle well before this new regulation was enacted in 2010. So if Your Honor looks at Sections H1 and H2 of the regulation, those precede H3, which is the new regulation. And H1 and H2, I apologize, I don't know the exact date that they were enacted, but they preexisted the current regulation that we're talking about today. Those embody the quid pro quo principle that had been discussed as well by the Supreme Court, and they say that you have to do math. So H1 and H2 say that the burden is on the taxpayer. When the taxpayer receives partial consideration in return for a donation, the taxpayer has to prove that they should actually be able to claim some other portion of their donation as a contribution, and they ask the taxpayer to, they require the taxpayer to do math. So the quid pro quo principle was not only discussed by the Supreme Court, not only embodied in 1967 IRS guidance, but also spelled out in IRS regulations implementing Section 170 long before the current regulation. And so, you know, all these bases, I think, are why the IRS reading of Section 170 in the current regulation is the best reading. I feel like this case really represents the clash between two sort of historically somewhat grounded principles, right? One is this quid pro quo notion, which I, as you point out, is well established in law. The Supreme Court has blessed it. And then the second is the notion that tax benefits aren't like a good or service that might count as income for some purposes and things like that. So that's what I think makes this case harder and raises the question, who gets to decide who wins in that clash? Is that the IRS or is that Congress? Well, I don't think that there's a conflict between the IRS and Congress, and I would again go back to the language of Bob Jones. Pre-Chevron, where the Supreme Court gave great effect to the IRS's role, obligation, not just ability. But I would say in Bob Jones, the Supreme Court expressly said, in the first instance, the responsibility for construing the code falls to the IRS. Since Congress cannot be expected to anticipate every conceivable problem, it relies on the administrators of the statutes to implement the legislative will. The Supreme Court also said the IRS has the responsibility in the first instance to determine whether a particular entity is charitable under 170. And I would disagree with my colleague about the meaning of the delegation of authority in Section 170. If you're going to verify a contribution, you also would encompass the ability to decide if it really is a charitable contribution at all. It is weird language, though, right? I mean, you might have expected to say, as defined by the agency. And by using this term, giving the agency the authority to verify, I mean, you could see why that might seem different from the cases where language says you can interpret. Right? Because there's what supporting materials do you have to provide? That seems like a verification. I mean, I think that it's been given a cramped reading, I think, respectfully, by my colleagues representing Scarsdale. There's no definition or case law gloss that I've been pointed to that gives verify such a narrow meaning. The cases that my colleagues have pointed to on verification, all of those cases actually assume that the underlying character of the payment or contribution in question is charitable. And then those cases simply look at whether enough paperwork, for example, was submitted to verify those. So even the cases that my colleagues point to don't actually say that verification has such a cramped meaning in itself. And I'm not aware of any authority that would cramp it in that way. Is the fiscal impact of these programs on the IRS's anticipated revenues a legitimate consideration for the agency in deciding what charitable contribution means? I think so, Your Honor, particularly as to the effect on the 2017 Tax Cuts and Jobs Act. I think that the IRS certainly has the ability to take into account the fact that these funds, particularly the ones that were established recently, are cutting the legs out of the crucial revenue-raising function of that particular act. And I think we're all going to agree that that was the purpose of these funds. So I think it is legitimate. But that gets back to this question of, well, wait a minute. Did this term, charitable contribution, mean something different after 2017 from what it meant before? And I thought what I heard you say is, well, what we're saying now has always been the best meaning, but facts on the ground changed in 2017 and created the incentive for the agency to sort of take action on embodying the best. Is that a fair sort of? I think that's right. And it might be illustrative, possibly, to look at the 2010 memo, which my colleagues have pointed to as the prior position of the IRS, which it was. And so in 2010, the IRS memo, the CCA memo, rather, said that state tax credits received in return for contributions to certain tax credit programs could be taken as charitable contributions, Section 170 deductions. And the IRS chief counsel advice memo did say that, but the facts on the ground were completely different, because at that point there was an uncapped SALT deduction. So it really didn't matter. A taxpayer could choose to take that as a 170 deduction or as a 164 SALT deduction. And one might imagine that the chief counsel just didn't want to put the thumb on the scale one way or the other and say, no, don't give it to a charitable fund established by the state. So the IRS just didn't have an incentive to insist on the best interpretation back then because it was a dollar here, a dollar there. That's right. That was, in fact, the factual situation on the ground back then, Your Honor. And we explained in our brief why the reasoning of the CCA memo was suspect. So again, to the extent that I've not been clear about it, I don't think that the meaning of Section 170 has changed. Again, the quid pro quo principle has been in place in law, in IRS guidance, recognized by the Supreme Court for decades now. That has never changed. So that would suggest that the fiscal impact in light of the SALT cap probably isn't a legitimate consideration because that's something that only came about in 2017. In other words, it doesn't tell us what the term means. It might provide the incentive for the IRS to have gotten a little more focused about what it means, but it didn't change the meaning. No, it certainly did not change the meaning, Your Honor. But I definitely would not say that it was illegitimate for the IRS to consider that and to want to preserve the functional purpose of the SALT cap deduction. I wanted to point out a couple of other cases for the Court briefly. In the Mayo Foundation case, which we cite in our briefing, the Supreme Court recognized that the imposition of the 40-hour rule in that case by the IRS was a line-drawing exercise but said that the IRS was using its expertise to create and draw an easily administrable line that did have some relation to the fact that rules were— So is that—I think you're jumping in. I was going to ask, even if we agree with your interpretation of the statute that still doesn't explain, like, why 15% versus 20% versus 25%? So you can please answer, but if you could know that that's in the back of my mind. Yes, Your Honor. Well, I can go straight to that. I think I was just making a freestanding point. So, Your Honor, the IRS actually does explain the 15% line, and it relates it to an essential desire to create fairness and equity in terms of treating state and local tax credit programs that maybe are smaller. You know, maybe only—you return 15% benefit as opposed to 85% or 95%. They would want to treat those the same as tax incentives that provide you not with credits but with deductions. I mean, I think that is probably the more common form of a tax incentive is to provide a deduction rather than a credit. And the IRS calculated what it assessed to be the highest total state and local deduction around the country, which it calculated to be 15%. And it did explain this in its notice of proposed rulemaking. And that's why it came up with the 15% line, where if you donate to a tax credit program that only provides you with a return credit of 15%, then the IRS is going to treat that the same as a tax deduction program. So the IRS did explain the 15%. And, yes, it was a line-drawing exercise, but it was a reasoned line-drawing exercise. It was intended to provide fairness and equal treatment. So it sounded like in your last answer you were trying to preempt a question about the distinction between the deduction and the tax credit. So can you just give it a little more meat than what you just said? Of course, Your Honor. And I think questions from Judge Sack and Judge Robinson sort of pointed out the fact that counsel's argument might prove too much, which is that perhaps it would be easier to understand as an application of the principles here if the IRS had said, well, we're going to fold in the treatment of deductions the same way we're treating credits as opposed to the other way around. But for a number of purposes, the IRS is tolerating tax deduction programs up to a point. So number one certainly is the practical considerations that Judge Robinson asked about. We have a footnote in our brief where we show that it would involve these recursive calculations. The effect of a deduction would be different for almost every taxpayer depending on their marginal tax rate, other types of considerations that might inform their tax base. And so deductions would be much, much harder to account for in terms of performing the quid pro quo analysis. But, Your Honor, I would also like to suggest, not just suggest, but note that the IRS said that it doesn't want to disincentivize charitable giving altogether. There is a federal deduction, right? So Section 170 is a federal tax deduction for charitable giving. And so the IRS realizes that there is an incentive to do this that states, localities, and the federal government provide. And the IRS is balancing that against these much more valuable tax credits that provide a much greater opportunity for abuse. So those are just two of the very important reasons why the IRS is justified in treating deductions differently. But, as I noted, the 15% exception that is in the new regulation is intended to treat them fairly and sort of similarly to each other. The other point that I wanted to make about the Mayo Foundation case is that, in that case, the Supreme Court looked at 7805, and this was pre-Loper Bright, to be sure, but did just recognize 7805 as a powerful grant of discretion to the Secretary. I also wanted to discuss briefly the Shettleman case, which was before this Court. The Shettleman case is actually, I think, helpful to the defendant's arguments. In Shettleman, the Second Circuit expressly recognized the quid pro quo principle. The IRS, I'm sorry, the Second Circuit emphasized looking at the external features of transactions. That's what the regulation does. The regulation does not inquire into the subjective motivations of individual taxpayers. It just said, you donated this much to a fund. You got this percentage back. That's all it does. And in Shettleman, the donor, there was a donor taxpayer in that case. They donated a conservation easement to a tax-exempt organization, and then they also made a cash contribution to that tax-exempt organization because the organization required them to make the cash contribution to essentially administer the easement. And the court, the Second Circuit, said that none of that had to be viewed as a return benefit because in that case, the donor was not getting anything in return for anything, for any of these donations. Yes, the donor could take the federal charitable deduction, but again, that is the purpose of the federal charitable deduction, is to incentivize these kinds of donations. And so Shettleman presents no problem to the defendant's arguments in this case. I mean, that's an interesting gloss. It does seem to me that the court gave a reason why you didn't need to worry about the deductions as some sort of quid pro quo, and it sort of talked about the – it rejected the notion that at least that tax benefit was a quid pro quo, right? So I guess you need to explain why – is it the distinction between a deduction and a tax credit? Yes, so the tax benefit in Shettleman was simply the deduction. It wasn't a dollar-for-dollar tax credit. And again, Section 170 is itself a deduction. Section 170 is itself an incentive and a tax benefit. And so the Second Circuit said, you know, really, in this case, the donor wasn't getting anything in return. There was really no quid pro quo here, and so there's no problem with them taking – It's just hard to – if you read, Shettleman received nothing in return for her cash donation and facade conservation easement. It is true the taxpayer hoped to obtain a charitable deduction for her gifts, but this would not come from the recipient and it would not be a quid pro quo. It's hard not to see how you couldn't just substitute credit in there. I mean, the rationale doesn't seem like – there's something about the rationale that would suggest that credit would be subject to a different analysis. I guess that's what I'm looking for, is I know the fact – there's a factual distinction, but what's the conceptual distinction? Well, the IRS, frankly, admitted and has acknowledged that deductions could be quid pro quo. So the IRS acknowledges that. It acknowledged that in explaining the proposed rule and implementing it. So the IRS does not actually dispute what Your Honor is saying, but for the reasons that we have discussed, deductions tend to be much, much, much smaller. Deductions would be very hard to administrate, both for the taxpayer and for the IRS. And, of course, deductions are, for example, provided by 170 itself to incentivize charitable giving. For those reasons, yes, the IRS says that they are a quid pro quo, but of a different character, a different level of administrability, et cetera. I think I would denote just one last case, unless the Court has other questions. I think my colleague cited the Temple case in which credits were not found to be accessions to wealth under 61. First of all, Temple, Browning, Randall, all cases cited by my opponents, none of them had to do with considerations under 170 and the particular statutory regulatory quid pro quo considerations and definitions that come with 170. So they're really not relevant. But I would say that another case, Maines, said that when taxpayers got tax credit back, that essentially were in exchange for no tax liability. In Maines, particular taxpayers got these very, very valuable tax credit back, and they had no underlying state tax liability. In Maines, the tax court said, well, that is an accession to wealth, so that is income. That was a refundable state tax credit? Yes. Right. Under a particular program. Are there refundable credits here? No. I don't believe so, although I'm not 100% sure. Okay. Fair enough. I just wonder whether that's a distinction that would matter in terms of how readily you could call something a quid pro quo in the context of sort of the case law that had developed. I understand, Your Honor. I cited Maines just to, I think, dispel the notion that there has been unlimited tolerance for return benefits of all kinds under any section of the IRC. Unless the Court has further questions, I'm happy to sit down and rest on the briefs. We appreciate your argument. Thank you. Ms. Dryden. Thank you, Your Honors. Four quick points on rebuttal. First, as to Temple and Maines and the status of the quid pro quo doctrine before the TCJA. In fact, the tax court was quite firm and relied on the IRS's representations that because the state tax credit at issue was not an accession to wealth, it therefore couldn't be considered in part a sale and not a refund. And part a gift that would require offset as a charitable deduction. And as to Maines, I think you're correctly right. You're right, Your Honor, that it involved refundable tax credits, which would be cash in pocket to the taxpayer. But none of the credits at issue here are actually refundable. And so even before the TCJA, the courts recognized that state tax credits were nevertheless not a quid pro quo. And that's even when under the alternative minimum tax, you could have no salts deduction and nevertheless take the full charitable deduction. And even when you were donating to programs that offered 100 percent credits, you know, for educational considerations, et cetera. And so I think before the TCJA, it was clear that tax credits were nevertheless not quid pro quos. And there was nothing in the TCJA that changed Section 170's meaning. Second, Judge Robinson, your point on administrative complexions, that as I think- I'm sorry, administrative what? Administrative complexities. Simply not a textual consideration as opposed to something that Congress could legislate against. But also- You're right. No, keep going. I was just going to say it also explains why the rule is nevertheless arbitrary and capricious and is one other reason why you could set aside the rule even if you weren't focused on the Section 170 text question. As this Court made clear in cases like Catskill Mountains, arbitrary and capricious review is enough to set aside a rule regardless. The states pointed out the administrative complexities that would result in credits being off limits as opposed to deductions. And the agency simply ignored it. And I think under cases like Ohio v. EPA, presenting those valid concerns and having no response whatsoever from the agency actually is a check against the agency's reasoning in that case. Third, even if the particular state's programs were, in fact, a workaround, I think Your Honor recognized that the tax code accepts the fact that there are workarounds. We had pointed to the administrative minimum tax. I also think it's relevant that federal income taxes themselves are non-deductible under Section 275 of the tax code. But the charitable contribution remained fully deductible even if you were trying to use your federal income tax- And so is that a statutory- That's an arbitrary and capricious argument. Sorry, Your Honor. That is- I'm back to the textual argument. But the point is, even if you were worried about workarounds pre-TCJA in 2017, there were those considerations that Congress didn't see fit to legislate against. And even with enacting Section 164, it didn't change the relevant text of Section 170. And my last point, Your Honor, is post-Loeb or Bright, all that's left here really is Skidmore deference, considering that we don't actually have a grant of rulemaking authority that would allow the IRS to interpret gift or contribution under Section 170. And as the State's explained, Skidmore is not appropriate here precisely because this is a departure from the understanding of Section 170. Okay. I think we have your point. I appreciate it. I thank all of you. It was an excellent argument all around. Good briefing, and we'll take- Very good. As a point of personal privilege, just to agree with you, that's a superb argument. I've heard a few, but that's just- on all parts, it's a superb argument. I congratulate you, partly because of the sum of the questioning, but a superb one. And I really congratulate you. It makes me feel good. But I would add that for federal employees, federal attorneys, this might not be a good time to ask for a raise. But it's superb. Thank you. Thank you all very much. We'll take it under advisement. Appreciate it.